**MIDLAND–ROSS CORPORATION,**
Plaintiff,

v.

**SUNBEAM EQUIPMENT CORPORA-TION and Robert W. Smith,**
Defendants.

**Civ. A. No. 70–769.**

United States District Court,
W. D. Pennsylvania.

Aug. 17, 1970.

---

Tucker, Burke, Campbell & Arensberg, Pittsburgh, Pa., for plaintiff.

Eckert, Seamans & Cherin, Pittsburgh, Pa., for defendant.

## OPINION

GOURLEY, District Judge:

In this civil action, the Complaint asserts two causes of action. The first cause of action is founded upon the alleged infringement by defendant Sunbeam Equipment Corporation of two patents claimed by plaintiff involving the construction and general method of operation of carburizing furnaces manufactured by plaintiff's Surface Combustion Division. The relief sought upon this first cause of action is damages and a permanent injunction. The second cause of action is founded upon the al-alleged misappropriation of plaintiff's trade secrets relating to carburizing furnaces by defendant Smith, who is a former employee of plaintiff, and by defendant Sunbeam Equipment Corporation, which has now employed defendant Smith. The relief sought upon this second cause of action is a temporary restraining order, preliminary injunction, and final injunction.

The only matter presently before this member of the Court, sitting as Miscellaneous Judge, is the request for preliminary injunctive relief upon the second cause of action. Based upon the Affidavits accompanying the Complaint, the Court entered a Temporary Restraining Order on July 1, 1970. A lengthy hearing upon plaintiff's request for a preliminary injunction commenced on July 8, 1970 and concluded on August 4, 1970. On the basis of the pleadings, briefs and arguments of counsel, and the oral and documentary evidence offered at the hearings, it is the considered judgment of the Court that plaintiff's request for a preliminary injunction should be denied.

A preliminary injunction is an extraordinary remedy and only may be granted upon a substantial showing by plaintiff that it is entitled to the drastic relief requested. Plaintiff must show, not alternatively but conjunctively, three things: first, that plaintiff will suffer immediate irreparable injury if the preliminary injunction is not granted; sec-ond, that balancing the conveniences and possible injuries to both parties, the scales of equity weigh in favor of plaintiff, and third, that plaintiff is reasonably likely to succeed in establishing its case on the merits in a full hearing for final injunctive relief. I. T. S. Industria Tessuti Speciali v. Aerfab Corp., 280 F. Supp. 581, 585 (S.D.N.Y.1967).

Counsel for each of the parties have most ably, conscientiously, and thoroughly presented their respective client's causes. The issues are highly technical and do not admit of easy resolution by a lay person. I do not believe that plaintiff has sustained its burden of proving that it will suffer immediate irreparable injury or that it is reasonably likely to succeed in establishing the merits of its cause upon a final hearing. Also, I believe that the detriment resulting to defendant Smith from a granting of the relief requested herein would exceed that resulting to plaintiff by a denial of said relief.

In support of its decision, the Court enters the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

*Jurisdiction and Parties*

1. Plaintiff, Midland-Ross Corporation (hereinafter referred to as plaintiff), is a corporation incorporated under the laws of the State of Ohio and has its principal office at Cleveland, Ohio. Surface Combustion Division is an unincorporated division of Midland-Ross.

2. Defendant Sunbeam Equipment Corporation (hereinafter referred to as "Sunbeam"), is a corporation incorporated under the laws of the State of Delaware and has its principal place of business at Meadville, Pennsylvania. The individual defendant, Robert W. Smith (hereinafter referred to as "Smith"), is a citizen and resident of the State of Pennsylvania.

3. The amount in controversy exceeds $10,000, exclusive of interest and costs.

*Background of the Industrial Product Involved*

4. Plaintiff, through its Surface Combustion Division, manufactures various types of heating furnaces. The present controversy involves two specific kinds of furnaces, the side-fan zone controlled carburizing furnace and the annealing-blueing furnace.

5. Both carburizing and annealing-blueing furnaces are old in the art. Roof-fan and side-fan carburizers have been commercially available for many years.

6. As a result of research commencing in 1962, plaintiff was able to develop and place on the market in 1964 the first of a particular type of side-fan carburizer designated as a side-fan zone controlled carburizing furnace. Plaintiff has now manufactured ninety-seven such furnaces.

7. Sunbeam has been manufacturing annealing-blueing furnaces since approximately 1950. It has manufactured only one side-fan zone controlled carburizing furnace, which furnace was sold to the Chrysler Corporation on or about October 26, 1968 for installation at Chrysler's Indianapolis, Indiana plant.

*The Techniques and Methods of Adjustment Alleged to be Trade Secrets*

8. With respect to the side-fan zone controlled carburizing furnace, plaintiff employs particular procedures and techniques to adjust it and place it in working order. With respect to annealing-blueing furnaces, plaintiff has developed a specific time-temperature-atmosphere cycle.

9. In detail, the techniques and methods of adjustment alleged to be trade secrets are the following:

(a) With respect to the side-fan zone-controlled carburizing furnace,

(1) The construction detail of introducing an oxidant such as air, steam, flue gas, etc. into the heating zone, as referred to in Paragraph A-1 of plaintiff's Exhibit 6.

(2) The technique of balancing of atmosphere flow through the hearth of the furnace as referred to in plaintiff's Exhibit 5, Paragraph A-2 of plaintiff's Exhibit 6, and plaintiff's Exhibit 10.

(3) The technique of balancing of temperature above and below the hearth of the furnace by measuring the temperature in the various pier spaces below the lower radiant tube in each such space and adjusting the fuel input to such radiant tubes as referred to in Tr. 423 and on page 2 of plaintiff's Exhibit 4 under "Heat Input and Distribution", Paragraph A-3 of plaintiff's Exhibit 6, and plaintiff's Exhibit 11.

(4) The control or regulation of the movement of atmosphere within the furnaces in the direction of the carburizing zone by means of the proper sizing of the openings of the effluents or stacks located at the carburizing zone and the diffusing zone and the provision of different volumes of atmosphere to the various zones, as referred to on page 4 of plaintiff's Exhibit 4; Paragraph A-4 of plaintiff's Exhibit 6; and plaintiff's Exhibit 12.

(5) The use of a stable metal oxide coating such as aluminum oxide in conjunction with a fused quartz liner to reduce or eliminate soot deposition in atmosphere sample tubes, as referred to in Paragraph A-5 of plaintiff's Exhibit 6 and Court Exhibit 1.

(b) With respect to the combination annealing and blueing furnace, the specific time-temperature cycle and the specific atmosphere compositions set forth on plaintiff's Exhibit 13.

*Findings Relevant to Whether the Aforementioned Techniques and Methods of Adjustment are Trade Secrets*

10. All of the alleged trade secrets are contained within the interiors of the furnaces sold by plaintiff to its customers.

11. One skilled in the art of industrial furnace design and construction would be able to ascertain any of the alleged trade secrets from an examina-

tion and study of the furnace under both operative and non-operative conditions. Such a study of the side-fan zone controlled carburizing furnace would require three to four weeks time.

12. Of the ninety-seven companies to which side-fan zone controlled furnaces have been sold, only one was known not to have personnel sufficiently competent to ascertain the alleged trade secrets upon examination of the furnace sold to it.

13. While it would be necessary for a furnace to be examined in an inoperative or "cold" state as well as in an operative or "hot" state, plaintiff's customers normally shut down their industrial furnaces on an annual basis.

14. Plaintiff imposes no restrictions upon its customers prohibiting them from making detailed examinations at any time of the furnaces sold to them or prohibiting them from disclosing to others the knowledge acquired by them regarding the furnaces.

15. That an oxidant such as air, steam or flue gas is introduced into the heating zone of the side-fan zone controlled carburizing furnace and the amount of flow of such an oxidant are ascertainable by a customer of plaintiff from the schematic drawing of piping lines and instruction manual provided by plaintiff. Also, the principle of introducing an oxidant into the heating zone of such a furnace is publicly disclosed in the patents of Orville E. Cullen introduced in evidence as plaintiff's Exhibit 7 and defendants' Exhibit 1.

16. The balancing of atmosphere flow through the hearth of a side-fan zone controlled carburizing furnace is accomplished by a commonly known technique of using a vein anemometer or hot wire anemometer to measure wind flow. The baffles and refractory placed over the ports to achieve uniform atmosphere flow are observable to the customer within the furnace and anyone skilled in the art of furnace design and con-struction would know why they were placed there. The use of the techniques of sizing of ports and constructing baffles to alter the velocity and direction of atmosphere flow have been known and employed for many years in the heating, refrigeration and air-conditioning fields.

17. The balancing of temperature above and below the hearth of a side-fan zone controlled carburizer by measuring the temperature in the various pier spaces below the lower radiant tube in each such space and adjusting the fuel input to such radiant tubes involves a well known principle that it is desirable to achieve uniform temperature around the surface of the load and a well known technique of using thermocouples for the purpose of measuring temperatures in the various areas of a furnace. The amount of fuel input in each of the radiant tubes is disclosed to plaintiff's customer in plaintiff's operating instructions.

18. The control or regulation of the movement of atmosphere within the furnace in the direction of the carburizing zone by means of the proper sizing of the openings of the effluents or stacks located at the carburizing zone and the diffusing zone and the provision of different volumes of atmosphere to the various zones involve techniques of widespread use and application in the furnace industry. The principles are disclosed in the patents of Orville E. Cullen introduced in evidence as plaintiff's Exhibit 7 and defendants' Exhibit 1. The orifice plate sizes and the volume of atmosphere flowing to the respective zones of the furnace are customarily shown in the operating instructions and drawings furnished to plaintiff's customers.

19. The use of a stable metal oxide coating such as aluminum oxide in conjunction with a fused quartz liner to eliminate soot deposition in atmosphere sampling tubes is readily ascertainable upon examination and analysis of the

sample tubes by plaintiff's customers. Also, the use of the coatings and inserts mentioned are disclosed in U. S. Patent No. 3,351,684 offered in evidence as defendants' Exhibit B.

20. The specific time-temperature-atmosphere cycle for a combination annealing and blueing furnace is ascertainable by the customer who utilizes it. The time-temperature cycle can be ascertained by a customer by using an accepted method of running a time-temperature profile on a work load going through a furnace. The customer is told by plaintiff what atmosphere is to be placed in the various zones of the furnace.

*The Employment of Defendant Smith*

21. Defendant Smith commenced work with plaintiff on December 6, 1965, at which time he was trained to start up and service industrial furnaces.

22. Prior to his employment with plaintiff, defendant Smith had been variously employed as an electrical draftsman, transit operator on a survey team and electronics technician.

23. Defendant Smith's job titles were, first, Erector, and later, Field Service Operations Engineer. His duties were to adjust and place in working order a furnace installed in a customer's plant. He usually performed this work with a technician and a tradesman hired in the local area of the plant. His job required a combination of mechanical skill and technical training.

24. During the course of defendant Smith's employment, knowledge of the techniques and methods of furnace adjustment set forth in paragraph 9 of these findings as (a) (2)–(a) (5) and (b) was imparted to him by plaintiff's personnel to enable him to perform his work with both side-fan zone controlled carburizing furnaces and blueing-annealing furnaces. Knowledge of the technique specified in (a) (1) of paragraph 9 was not so imparted to him.

25. At no time during the course of his employment was defendant Smith requested to sign, nor did he sign, any written agreement barring the disclosure of any information imparted to him in the course of his employment as a field service man. Mr. Joseph Lincoln, Chief Metallurgist and Manager of Heat Treat Technology Research and Development for plaintiff's Surface Combustion Division did sign such an agreement.

26. Defendant Smith was never told that any information communicated to him constituted a trade secret or was confidential or proprietary in nature. He was told informally on several occasions that information was not to be divulged outside the Company.

27. During the two week to two month period in which defendant Smith would be placing a furnace in working order at a customer's plant, his work usually would be performed in the presence of independent local building tradesmen employed to assist in the job and also in the presence and under the observation of a person in the customer's employ who was skilled in the industrial furnace field.

28. In or about February of 1970, defendant Sunbeam was looking for an experienced field service furnace man and approached and interviewed defendant Smith. Smith was offered by Sunbeam a three-thousand dollar increase in his annual salary.

29. On June 17, 1970, defendant Smith submitted his resignation to plaintiff, and he was last employed by plaintiff on July 2, 1970. Smith advised plaintiff that he was leaving because he did not believe that plaintiff's management evidenced sufficient concern for his future, because he thought he could make a contribution to Sunbeam, and because he chose to work for the highest bidder.

Plaintiff did not counteroffer to meet the offer of Sunbeam.

### Sunbeam's Sale and Maintenance of the Chrysler Furnace

30. Defendant Sunbeam sold to Chrysler Corporation for installation at Chrysler's Indianapolis, Indiana plant a side-fan zone controlled carburizing furnace ready to be placed in operation in early October, 1969.

31. Since the middle or end of November, 1969, the Sunbeam furnace at Chrysler has produced products satisfactory for Chrysler from a metallurgical standpoint. The steering mechanisms produced have been constantly uniform within the required tolerances.

32. Defendant Sunbeam hired defendant Smith because it had a need for experienced field service men. Defendant Smith was not hired specifically to service the Sunbeam furnace installed for Chrysler or to service any particular type of furnace.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and subject matter of this action.

2. A cause of action for misappropriation of trade secrets is a common law action in tort and is governed by State law. Van Products Co. v. General Welding & Fab. Co., 419 Pa. 248, 258–259, 213 A.2d 769 (1965).

3. A federal district must apply the conflict of laws rules of the State in which it sits. Klaxon Co. v. Stentor Electric Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

4. The applicable Pennsylvania rule is that, in an action founded upon tort, the law of the state which has the most significant relationship with the occurrences and the parties should govern. Griffith v. United Airlines, Inc., 416 Pa. 1, 15, 203 A.2d 796 (1964).

5. The law of Pennsylvania is applicable here for the reason that it is the State having the most significant relationship with the occurrences and the parties. The principal place of business of defendant Sunbeam and the past and present domicile of defendant Smith are in Pennsylvania. The hiring away of defendant Smith by defendant Sunbeam occurred in Pennsylvania and the employment relationship between defendant Smith and defendant Sunbeam is based in Pennsylvania. The alleged or threatened appropriation of trade secrets would have occurred or would occur in Pennsylvania.

6. To be entitled to equitable relief, plaintiff had the burden of showing, among other things, that the techniques and methods of adjustment imparted by plaintiff to defendant Smith were, in fact, trade secrets. Van Prod. Co., supra, 419 Pa. at 259, 213 A.2d 769.

7. The sale of a product containing trade secrets constitutes a public disclosure which defeats a claim founded upon those trade secrets where the nature of the trade secrets is ascertainable by inspection of the product. Van Prod. Co., supra, at 265–266, 213 A.2d 769, Cornell-Dublier Electric Corporation v. Aerovox Corporation et al., 71 U.S.P.Q. 153, 154, (Mass.Sup.Ct.1946), Restatement of Torts, Section 757, Comment (b), Milgrim, Trade Secrets (1970), § 205(2). Even though a marketed product would have to be rendered inoperative and examined by a skilled engineer in order for a discovery to be made of the trade secrets contained therein, the sale of such a product nevertheless constitutes a public disclosure which will defeat a claim founded upon the trade secrets contained in the product. Midland-Ross Corporation v. Yokana, 293 F.2d 411, 413 (3d Cir. 1961).

8. The very act of publishing a trade secret in a patent destroys the secretive nature of that which is disclosed therein. Van Prod. Co., supra, 419 Pa. at 265, 213 A.2d 769.

9. Methods of manufacture or design and details of construction which

are matters of general scientific knowledge in the industry do not constitute trade secrets. *Cornell-Dublier Corporation, supra,* 71 U.S.P.Q. at p. 154.

■■■ 10. Many of the techniques and methods of adjustment employed by plaintiff in its side-fan zone controlled carburizing furnaces involve the application of principles and use of measuring methods which are matters of general scientific knowledge in the industry and, therefore, do not constitute trade secrets.

11. None of the techniques and methods of adjustment employed by plaintiff in its side-fan zone controlled carburizing furnaces and blueing-annealing furnaces are trade secrets, for all have been disclosed to the public by virtue of patent publications, the provision of operating instructions to plaintiff's customers and the sale of the furnaces themselves, an examination of which by anyone skilled in the art of furnace design and construction would disclose the techniques and methods of adjustment employed in said furnaces.

12. Defendant Smith's continued use of techniques and methods of adjustment of carburizing furnaces learned in the employ of plaintiff will not do irreparable harm to plaintiff.

13. To preclude defendant Smith from continuing to use in the course of his employ with a furnace manufacturer other than plaintiff the wealth of experience and skill developed during his employment by plaintiff would deny him the opportunity to engage in the occupation in which he has developed the most expertise and would impose a greater hardship on him than will result to plaintiff by denying relief.

### ORDER

Now, this 17th day of August 1970, a Temporary Restraining Order having been entered and a hearing having been conducted upon plaintiff's request for a preliminary injunction, it is hereby ordered that the Temporary Restraining Order be and the same is hereby dis-

solved, and it is further ordered that plaintiff's request for a preliminary injunction against defendants be and the same is hereby denied.